# United States Court of Appeals
## For the First Circuit

No. 23-1216

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,

Debtors,

---

UBS FINANCIAL SERVICES INC., f/k/a UBS Financial Services Incorporated of Puerto Rico,

Movant, Appellee,

OFFICIAL COMMITTEE OF UNSECURED CREDITORS; DRIVETRAIN, LLC, in its capacity as the Trustee of the Commonwealth Avoidance Actions Trust,

Respondents, Appellees,

v.

ESTATE OF PEDRO JOSÉ NAZARIO SERRANO; ESTATE OF JUANITA SOSA PEREZ; JOEL RIVERA MORALES; MARÍA DE LOURDES GÓMEZ PÉREZ; HÉCTOR CRUZ VILLANUEVA; LOURDES RODRÍGUEZ; LUIS M. JORDÁN RIVERA,

Objectors, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

Before

Montecalvo, Hamilton,** and Rikelman,
Circuit Judges.

Harold D. Vicente-González, with whom Harold D. Vicente Colón and Vicente & Cuebas were on brief, for appellants.

Paul J. Lockwood, with whom Nicole A. DiSalvo, Skadden, Arps, Slate, Meagher & Flom LLP, Roberto C. Quiñones-Rivera, and McConnell Valdés LLC were on brief, for appellee UBS Financial Services Inc.

John Arrastia, Jr., with whom Angelo Castaldi, Continental PLLC, Juan J. Casillas Ayala, Natalia E. del Nido-Rodríguez, Luis F. Llach Zúñiga, Juan C. Nieves Gonzalez, and Casillas, Santiago & Torres LLC were on brief, for appellees Official Committee of Unsecured Creditors and Drivetrain, LLC.

May 21, 2024

\* Of the Southern District of New York, sitting by designation.

\*\* Of the Seventh Circuit, sitting by designation.

**MONTECALVO, _Circuit Judge_.** The Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") was established in 1951 as the Commonwealth's pension program for public employees. Objector-appellants are seven individual beneficiaries of pensions paid by ERS (collectively, "the ERS Beneficiaries"). For over a decade, the ERS Beneficiaries litigated claims against movant-appellee UBS Financial Services Inc. ("UBS") in the Commonwealth Court of First Instance ("the Commonwealth Court") related to UBS's role in issuing ERS pension funding bonds in 2008 ("the Commonwealth Action").

Meanwhile, in January 2022, as part of its broad authority to promulgate orders necessary to carry out the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), the district court confirmed the Modified Eighth Amended Title III Joint Plan of Adjustment ("the Plan"). Soon after, UBS filed a motion to enforce the Plan that resulted in the district court enjoining the ERS Beneficiaries from prosecuting the Commonwealth Action. For reasons explained below, we hold that permitting the ERS Beneficiaries to continue litigating the Commonwealth Action is incompatible with the terms of the Plan, and, accordingly, we affirm the district court's issuance of injunctive relief.

## I. Background[1]

### A. The 2008 ERS Pension Funding Bond Issuance and the ERS Beneficiaries' Commonwealth Action

The ERS Beneficiaries are recipients of pension payments made by ERS, the Commonwealth's "chronically underfunded" pension fund that required public employees to pay into ERS while they were working with promises of a pension during their retirement. In 2008, at the advice of its financial advisor, UBS, ERS attempted to cover its fiscal deficit by issuing $3 billion in bonds to fund its pension payments. These bonds, which were underwritten by UBS, failed to make up for ERS's budgetary shortfalls and, indeed, worsened ERS's financial condition. A few years later, in 2011, the Commonwealth acknowledged that ERS illegally authorized the 2008 bond issuance, and the Commonwealth legislature amended a statute to reinforce existing prohibitions on ERS's ability to issue bonds.

In September 2011, the ERS Beneficiaries filed the Commonwealth Action against UBS in the Commonwealth Court. The ERS Beneficiaries initially brought the case as a derivative action to recover for alleged injuries to ERS that were caused by UBS's conduct in directing the 2008 bond issuance. ERS later joined the

---

[1] As necessary background for the present case and for the sole purpose of summarizing the underlying litigation against UBS, we accept the well-pled facts as true from the complaints contained in the record before us.

Commonwealth Action as a plaintiff itself. But the ERS Beneficiaries insist that, even after ERS became a plaintiff in the Commonwealth Action, their claims were tied to their own direct injuries and distinguishable from the derivative harm based on ERS's injuries. Most recently, in March 2019, the ERS Beneficiaries and ERS filed a fourth-amended complaint ("FAC") in the Commonwealth Action.[2] The FAC appears to raise claims against UBS based on breach of contract; breach of fiduciary duty; and Article 1802 (codified at P.R. Laws Ann. tit. 31, § 5141), the Commonwealth's general tort statute.[3]

**B. PROMESA, the Underwriter Action, and Confirmation of the Plan**

Unfortunately, ERS's financial difficulties were part of a much larger "fiscal emergency in Puerto Rico." 48 U.S.C. § 2194(m)(1). As Congress found when enacting PROMESA in 2016, the Commonwealth became "unable to provide its citizens with

---

[2] As UBS notes, on September 23, 2022, the ERS Beneficiaries moved the Commonwealth Court for leave to file a fifth-amended complaint in the Commonwealth Action after the district court ruled on UBS's motion to enforce the Plan. Because it is unclear whether the Commonwealth Court granted the ERS Beneficiaries leave to amend and the district court issued its injunction based on the allegations contained in the fourth-amended complaint ("FAC"), we refer to the allegations contained in the FAC only.

[3] We intentionally generalize our description of the ERS Beneficiaries' claims, as the FAC does not specifically identify or label every cause of action. But, as will be explained, we evaluate the pertinent causes of action that the ERS Beneficiaries cited before the district court to assess whether they should have been permitted to maintain the Commonwealth Action.

effective services" due to "[a] combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing." Id. § 2194(m)(1)-(2). With the aim of "provid[ing] the Government of Puerto Rico with the resources and the tools" necessary for its financial recovery, PROMESA created the Financial Oversight and Management Board ("the Board"), "an oversight mechanism" that manages the Commonwealth's broadscale debt restructuring. Id. § 2194(n)(1), (3); see also Fin. Oversight & Mgmt. Bd. for P.R. v. Federacion de Maestros de P.R., Inc. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 32 F.4th 67, 74-75 (1st Cir. 2022) [hereinafter Federacion de Maestros].

In August 2018, the Board appointed a Special Claims Committee ("the Committee") to initiate adversary proceedings on behalf of ERS pursuant to Title III of PROMESA in federal district court. On May 2, 2019, the Committee filed a Title III adversary proceeding against UBS and other financial institutions that underwrote the failed ERS pension funding bonds in 2008 ("the Underwriter Action"). With respect to UBS (and in highly simplified terms), the Underwriter Action alleges that UBS breached its contractual and fiduciary obligations to the Commonwealth in orchestrating the issuance of the ERS bonds, resulting in unjust enrichment to UBS and significant damage to ERS.

Approximately two years before the Underwriter Action was filed, "the Board initiated proceedings under Title III to restructure the debts of the Commonwealth and a number of its instrumentalities," including ERS. Federacion de Maestros, 32 F.4th at 75. "After several years of labor -- involving extensive mediation and negotiations with numerous stakeholders -- the Board presented the Plan of Adjustment (the Eighth Amended version)," id., a comprehensive set of agreements to restructure the Commonwealth and ERS's debts, to the district court for approval.

The district court confirmed the Plan in January 2022. In its confirmation order, the district court emphasized that, while the Plan was not universally lauded, the Plan "constitutes a crucial step in the effort to achieve the economic recovery of the Commonwealth of Puerto Rico and its instrumentalities." The district court specifically highlighted that it had received letters and emails from "government workers and retirees" who would be impacted by the Plan's effects on ERS, and the court recognized these pensioners' "anxieties concerning their ability to support their families and live in a dignified way in retirement."

Among myriad other things, the Plan implemented several changes related to ERS and its pension plan payments to retired Commonwealth employees. Of particular relevance here, the Plan replaced the Committee with the Avoidance Action Trustee ("the Trustee") as the plaintiff with exclusive power to prosecute the

- 7 -

Underwriter Action and recover damages that ERS incurred. Furthermore, the Plan ordered the immediate dissolution of ERS. Practically speaking, once the Plan was approved, ERS ceased to exist as an entity and all remaining ERS assets were transferred to the Commonwealth. Lastly, and quite importantly, the Plan prohibited the reduction of ERS pension payments for current beneficiaries (including the ERS Beneficiaries) and established a new trust fund to manage the Commonwealth's pension obligations.

## C. UBS's Motion to Enforce the Plan

On July 28, 2022, UBS filed a motion to enforce the Plan, requesting that the district court enjoin the ERS Beneficiaries from pursuing the Commonwealth Action. UBS argued that "the Plan transferred [the ERS Beneficiaries' Commonwealth Action claims] from the ERS to a litigation trust created for the benefit of other creditors" or "to the Commonwealth." UBS thus contended that, because "the claims **no longer** belong to ERS and its beneficiaries"; the ERS Beneficiaries sought to raise "the same claims brought in the Underwriter . . . Action"; and ERS had been dissolved, the ERS Beneficiaries violated the Plan by continuing to litigate the Commonwealth Action.

In response to UBS's motion, the ERS Beneficiaries maintained that "the claims brought in the Commonwealth Action are not the same as the claims asserted in the Underwriter . . . Action." According to the ERS Beneficiaries, the Plan did not

- 8 -

preclude them from seeking damages caused by UBS's conduct in directing the 2008 ERS bond issuance on behalf of "the ERS Individual Plaintiffs." In other words, the ERS Beneficiaries urged the district court to conclude that their Commonwealth Action claims were not purely derivative of ERS's injuries covered by the Underwriter Action so they could continue to independently litigate the Commonwealth Action.

On November 29, 2022, the district court granted UBS's motion to enforce and enjoined the ERS Beneficiaries from pursuing the Commonwealth Action. The district court concluded that the ERS Beneficiaries' Commonwealth Action claims were rooted in "a generalized injury -- anticipated diminution of retirement benefits as a result of ERS'[s] financial condition," meaning that the claims were "derivative of ERS'[s] right to recover on its own behalf."

The district court further rejected the ERS Beneficiaries' arguments that they were entitled to recover for "non-derivative general tort claims against UBS" under various Commonwealth statutes. In particular, the district court held that even "[t]o the extent [these Commonwealth statutes] granted a cause of action to recoup damages suffered by ERS or by ERS plan participants or pension beneficiaries" attributable to UBS's conduct, the Plan abrogated the ERS Beneficiaries' ability "to assert claims on ERS'[s] behalf." The district court ultimately

reasoned that, because the Commonwealth Action "seeks to recover assets that, under the confirmed Plan, neither belong to ERS nor are resources designated to cover ERS'[s] former obligations to the ERS Beneficiaries," the ERS Beneficiaries were barred from maintaining the Commonwealth Action.

On January 26, 2023, the district court denied the ERS Beneficiaries' motion for reconsideration on largely the same grounds as its original order and rejected the ERS Beneficiaries' new argument that the injunction constituted a "judicial taking."

The ERS Beneficiaries timely appealed the district court's rulings on UBS's motion to enforce the Plan and the ERS Beneficiaries' motion for reconsideration.[4]

## II. Discussion

Pursuant to 11 U.S.C. § 105(a), a provision of the federal Bankruptcy Code that PROMESA adopted through 48 U.S.C. § 2161, the district court is empowered to "issue any order, process, or judgment that is necessary or appropriate to carry out

---

[4] In their briefing before us, the ERS Beneficiaries do not present any arguments challenging the district court's denial of their motion for reconsideration. Consequently, we will not address any issues related to the ERS Beneficiaries' motion for reconsideration. See Vargas-Colón v. Fundación Damas, Inc., 864 F.3d 14, 21 n.13 (1st Cir. 2017) ("Because plaintiffs do not offer any argument relating to the denial of their motion for reconsideration in their briefs, we need not discuss this aspect of the case any further.").

the provisions of [PROMESA]." 11 U.S.C. § 105(a). This wide-ranging grant of authority includes issuing injunctive relief to prevent parties from litigating derivative claims that belong to the estate. See Picard v. Fairfield Greenwich Ltd., 762 F.3d 199, 211 (2d Cir. 2014) (explaining that "a court has the power pursuant to section 105(a) to enjoin claims against a non-debtor third party where those claims are derivative" of injuries to the estate). In addition, the Plan itself contemplates that the district court retained jurisdiction to "resolve any cases, controversies, suits, disputes[,] or other challenges of any kind that may arise in connection with the consummation, interpretation[,] or enforcement of the Plan" and to issue any orders "necessary or appropriate to enforce or restrain interference . . . with consummation or enforcement of the Plan."

When reviewing the district court's decision to issue injunctive relief, we rely on the abuse-of-discretion standard. Shell Co. (P.R.) v. Los Frailes Serv. Station, Inc., 605 F.3d 10, 19 (1st Cir. 2010). "This deferential standard, however, applies to 'issues of judgment and balancing of conflicting factors,' and we still review rulings on abstract legal issues de novo and findings of fact for clear error." Water Keeper All. v. U.S. Dep't of Def., 271 F.3d 21, 30 (1st Cir. 2001) (quoting Cablevision of Bos., Inc. v. Pub. Improvement Comm'n of Bos., 184 F.3d 88, 96 (1st Cir. 1999)).

The ERS Beneficiaries challenge the injunction barring them from prosecuting the Commonwealth Action on grounds that the district court wrongly determined that their claims were derivative of ERS's injuries and duplicative of the Underwriter Action claims. We begin with a brief overview of derivative claims in the bankruptcy context and then assess whether the district court erred in concluding that the ERS Beneficiaries raised derivative claims in the Commonwealth Action.

## A. Derivative Claims in Bankruptcy

"[W]hen a cause of action belongs to the bankruptcy estate, the trustee has the exclusive right to assert it," and all other parties are precluded from bringing derivative or "general" claims to vindicate harm to the estate. In re Am. Cartage, Inc., 656 F.3d 82, 90 (1st Cir. 2011). As such, "[a] court tasked with determining who can pursue a particular claim must look to the kind of harm alleged." Id.; see also In re Bernard L. Madoff Inv. Sec. LLC (Madoff II), 740 F.3d 81, 89 (2d Cir. 2014) ("In assessing whether a claim is derivative, we inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted."). In addition, "[w]hether a particular state cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case." Matter of Educators Grp. Health

- 12 -

Tr., 25 F.3d 1281, 1284 (5th Cir. 1994); see also St. Paul Fire &

Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 700 (2d Cir. 1989).[5]

After evaluating the factual premises of the claims, if we conclude that "the alleged injury to a creditor is indirect or derives solely from an injury to the debtor, the claim is general," and the trustee has exclusive right to bring the claim on behalf of the estate. In re Am. Cartage, Inc., 656 F.3d at 90; see also In re Ontos, Inc., 478 F.3d 427, 433 (1st Cir. 2007) (explaining that "derivative claims are properly the property of the estate," and holding that "the trustee had the power to settle" those derivative claims); Madoff II, 740 F.3d at 93 (affirming injunction issued by federal bankruptcy court after concluding that the plaintiffs attempted to raise derivative claims belonging to the estate). On the other hand, "[c]laims are deemed personal, rather than general, when a creditor 'himself is harmed and no other

---

[5] The ERS Beneficiaries argue that the district court's reliance on St. Paul, 884 F.2d 688 (2d Cir. 1989), was "inapposite" and other Second Circuit cases have since abrogated St. Paul. But St. Paul's general discussion of derivative claims in bankruptcy cases conforms to the uncontroversial framework that this Circuit, the Second Circuit, and others have consistently utilized. See id. at 701 ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."). We thus see no error in citing St. Paul for these basic propositions. And contrary to the ERS Beneficiaries' telling, we are not convinced that the district court misapplied St. Paul's specific analysis of "whether an alter ego claim may be maintained by the bankruptcy trustee," id. at 699, nor can we ascertain any other error in its invocation of St. Paul.

- 13 -

claimant or creditor has an interest in the cause.'" In re Am. Cartage, Inc., 656 F.3d at 90 (quoting Koch Refin. v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339, 1348 (7th Cir. 1987)).

## B. The ERS Beneficiaries' Commonwealth Action Claims

The ERS Beneficiaries do not appear to dispute the fact that the Plan and PROMESA preclude them from raising derivative claims based on ERS's injury. Instead, the ERS Beneficiaries maintain that their Commonwealth Action claims "are separate and distinct from ERS'[s] own right to damages."

First, under the label of "Violation of Contractual Duties by UBS," the FAC appears to allege breach of contract and/or breach of fiduciary duty claims premised on UBS's "financial advisory contract with [ERS]" and its "negligent and reckless" recommendations to ERS related to the 2008 bond issuance. Second, and similarly, the ERS Beneficiaries sought to hold UBS liable under Article 1802, the Commonwealth's general tort statute, claiming that UBS engaged in "grossly negligent and illicit conduct . . . while providing the services [it was] required to render to [ERS] and the breach by [UBS] of [its] contractual, non-contractual[,] and fiduciary duties to [ERS]."

A close review of the FAC's allegations reveals that the ERS Beneficiaries' claims are wholly derivative of ERS's injuries. For example, the ERS Beneficiaries allege that:

- 14 -

- "UBS, in its capacity as Financial Consultant and investment advisor, had the fiduciary obligation and duty to alert the members of [ERS's] Board of Trustees of the risks inherent in the issuance [of the 2008 bonds]." (Emphasis added).
- "It is the inescapable duty of financial advisors such as UBS Consulting and UBS to defend the best interests of their clients (in this case [ERS]) and to provide them the correct advice for the benefit of the client and over their own. By not only endorsing, but also participating as the lead underwriter in the illicit and grossly negligent issuance of the Bonds, UBS violated its contractual, non-contractual[,] and fiduciary obligations towards [ERS]." (Emphases added).
- "UBS and UBS Consulting made recommendations to [ERS] that were obviously negligent and reckless because, as stated above, they failed to perform an adequate analysis of the risk in which [ERS] was placed as a result of the issuance and sale of the Bonds and the possible consequences of such transactions." (Emphases added).
- "UBS . . . held a financial advisory contract with [ERS] and . . . , in addition, acted as investment banker and lead underwriter in the issuance of Bonds, under contracts with [ERS]." (Emphases added).

In essence, the FAC relies entirely on the harm that UBS caused to ERS as part of UBS's contractual and fiduciary relationship with ERS. And the ERS Beneficiaries have made no effort to rebut the obvious fact that ERS (and now the Trustee) could have brought identical claims against UBS on its own behalf. See Matter of Educators Grp. Health Tr., 25 F.3d at 1286 ("It is well-established that the bankruptcy estate succeeds to the causes of action which the debtor could have brought as of the commencement of the case.").

While the ERS Beneficiaries are correct that tort claims do not require a "contractual relationship" between the parties,

the only underlying duty alleged in the FAC is the duty that UBS owed to ERS. Likewise, the ERS Beneficiaries broadly referenced their personal entitlement to damages, including recovery for reduced pension payments, but they explicitly tied those damages to the breach of contract and fiduciary duties that UBS owed to ERS. Specifically, the ERS Beneficiaries alleged that "[t]he grossly negligent and illicit conduct of UBS . . . while providing the services [it was] required to render to [ERS] and the breach by [UBS of its] contractual, non-contractual[,] and fiduciary duties to [ERS] caused [ERS] multi-million dollar damages, . . . and also caused damages to the [ERS Beneficiaries]." (Emphasis added).

At bottom, there is no way to read the FAC as raising any claims of direct injury to the ERS Beneficiaries. In fact, the diminution of ERS's assets -- allegedly resulting in reduced benefits to retirees and other financial consequences for the Commonwealth -- constitutes "an injury common to all" ERS pensioners and Commonwealth creditors who have "personally been injured only in an indirect manner," Koch Refin., 831 F.2d at 1349, rendering the ERS Beneficiaries' claims general and derivative.

Nonetheless, the ERS Beneficiaries aver that two other Commonwealth laws -- Act 3-2013 and Act 53-2021 -- permit them to maintain the Commonwealth Action, notwithstanding the derivative nature of the FAC's allegations. Act 3-2013 recognizes causes of

- 16 -

action brought by ERS "participants and pensioners" against "nongovernment investment advisers and underwriters in any transaction in which pension obligation bonds have been issued by [ERS] . . . for damages caused to [ERS] or its beneficiaries." 2013 P.R. Laws 3, § 40 (emphasis added). Article 517 of Act 53-2021 states that "Adjustment Plan transactions," including the district court's confirmation of the Plan, "cannot be used to mitigate causes of action under [Act] 3-2013." 2021 P.R. Laws 53, art. 517. But Act 53-2021 also notes that "[t]his [law] is subject to PROMESA" and "[a]ll laws of the Commonwealth of Puerto Rico that . . . are inconsistent with the terms and provisions of the Plan, the transactions contemplated therein, and/or the provisions of PROMESA, . . . are hereby preempted." Id. art. 604.

The ERS Beneficiaries have not meaningfully explained how these two laws require us to construe the FAC as raising direct rather than derivative claims. The district court underscored that "[a]s a result of the confirmation and consummation of the Plan, which protects the ERS Beneficiaries' accrued pension benefits and, as part of the series of settlements and compromises inherent in such a plan," the ERS Beneficiaries can no longer prosecute claims derived from ERS's injuries by virtue of the Plan and the PROMESA apparatus.

Put differently, it is possible that Act 3-2013, Act 53-2021, and the Plan allow ERS pensioners to raise non-derivative

- 17 -

claims arising from direct injuries inflicted upon them by investment advisors/underwriters. But those authorities cannot save the Commonwealth Action because that lawsuit involves purely derivative claims and indirect injury to the ERS Beneficiaries. The same is true even if the Commonwealth Action is not identical to the Underwriter Action; "[t]o the extent that this cause of action and others allege only a derivative harm to the [ERS Beneficiaries], they belong exclusively to the estate." Matter of Educators Grp. Health Tr., 25 F.3d at 1285. Consequently, and as explicitly noted in Act 53-2021, the ERS Beneficiaries cannot invoke Commonwealth statutes that may have authorized them to bring derivative claims prior to the Plan's confirmation because the Plan and PROMESA unequivocally prohibit bringing derivative claims. See 2021 P.R. Laws 53, art. 604.

Lastly, for the first time on appeal, the ERS Beneficiaries attempt to reframe their Commonwealth Action claims by arguing that they were injured "investors" in ERS. In that vein, the ERS Beneficiaries now assert that, because they were "investors" in ERS, UBS owed a fiduciary duty to them under the Uniform Securities Act of Puerto Rico ("PRUSA").[6] As UBS correctly

---

[6] At points in their briefing, the ERS Beneficiaries seem to conflate PRUSA with a regulation promulgated by the Puerto Rico Office of the Commissioner of Financial Institutions requiring investment advisors to "observe the highest standard of fiduciary duty toward their customers and investors." P.R. Regs. OCIF Reg. 6078, § 25.1.

points out, however, the ERS Beneficiaries have never previously described themselves as ERS "investors" and did not make this argument in opposing the motion to enforce. The FAC also does not contain any allegations that the ERS Beneficiaries are "investors," nor does it otherwise demonstrate the ERS Beneficiaries' intent to raise a PRUSA claim. Moreover, the ERS Beneficiaries did not file a reply before us to address UBS's contention that they cannot rely on the "investor" theory because it is a forfeited claim. We therefore see no reason to substantively evaluate this waived argument. See Thomas v. Rhode Island, 542 F.3d 944, 949 (1st Cir. 2008) ("Appellants cannot raise an argument on appeal that was not 'squarely and timely raised in the trial court.'" (quoting Iverson v. City of Boston, 452 F.3d 94, 102 (1st Cir. 2006))).

In short, because the FAC seeks to recover for indirect harm that the ERS Beneficiaries allegedly suffered based on UBS's conduct toward ERS, we must conclude that the ERS Beneficiaries sought to raise derivative claims that belong exclusively to the Trustee or the Commonwealth. See In re Am. Cartage, Inc., 656 F.3d at 90 (finding "the harm alleged [to be] derivative and indirect" after "an examination of the state court complaint, which only describes harm inflicted upon the debtor, its customers, and its assets"). The district court properly enjoined the ERS Beneficiaries from pursuing the Commonwealth Action, as continued

- 19 -

litigation of the FAC's derivative claims violates the terms of the Plan and PROMESA.

### III. Conclusion

For the foregoing reasons, we **affirm** the district court's injunction against the ERS Beneficiaries.